## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAY D. JACOBSEN,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.:** |
| ) | |
| **v.** ) | |
| ) | |
| **FEDERAL HOUSING FINANCE** ) | |
| **AGENCY, MARK A. CALABRIA,** ) | |
| **DIRECTOR, IN HIS OFFICIAL** ) | |
| **CAPACITY** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## COMPLAINT

Comes now, JAY D. JACOBSEN ("Plaintiff" or "Plaintiff"), by Counsel, for his

Complaint of Age Discrimination and Retaliation against Defendants Federal Housing Finance

Agency ("FHFA" or the "Agency") and Mark A. Calabria ("Calabria"), in violation of the Age

Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq.* ("ADEA") and the District

of Columbia Human Rights Act, D.C. Code §2-1402.11, *et seq..* The following allegations are

based on personal knowledge as to Plaintiff's own conduct and on information and belief as to

the acts of others.


## I.    THE PARTIES AND THEIR AGENTS

1.    Plaintiff  Jay D. Jacobsen is a natural person and at all times relevant hereto was a citizen

of the State of Maryland, residing in the State of Maryland. Plaintiff's year of birth is 1957.

2.      Plaintiff was 60 years of age at the time that he was assigned to new duties at the Agency under the supervision of Joyce.

3.      The Plaintiff had worked at the Federal Housing Finance Board ("FHFB")[1] beginning in 2004, which became part of the FHFA on September 4, 2008[2]

4.      One of the other agencies to become part of the FHFA, was the Office of Federal Housing Enterprise Oversight (OFHEO)[3], which had oversight over the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie") and the Federal National Mortgage Association ("Fannie Mae" or "Fannie").

5.      From February 1, 2004 through the creation of the new Agency, Mr. Plaintiff worked in the following areas:

---

[1] The FHFB managed the nation's Federal Home Loan Banks (FHLBs). Source: https://en.wikipedia.org/wiki/Federal_Housing_Finance_Board

[2] The Federal Housing Finance Agency (FHFA) is an independent federal agency created as the successor regulatory agency of the Federal Housing Finance Board (FHFB), the Office of Federal Housing Enterprise Oversight (OFHEO), and the U.S. Department of Housing and Urban Development government-sponsored enterprise mission team, absorbing the powers and regulatory authority of both entities, with expanded legal and regulatory authority, including the ability to place government sponsored enterprises (GSEs) into receivership or conservatorship. In its role as regulator, it regulates Fannie Mae, Freddie Mac, and the 11 Federal Home Loan Banks (FHLBanks, or FHLBank System). The law establishing the FHFA is the Federal Housing Finance Regulatory Reform Act of 2008, which is Division A of the larger Housing and Economic Recovery Act of 2008, Public Law 110-289, signed on July 30, 2008 by President George W. Bush. One year after the law was signed, the OFHEO and the FHFB went out of existence. All existing regulations, orders and decisions of OFHEO and the Finance Board remain in effect until modified or superseded. FHFA director Lockhart transmitted a "notice of establishment," for publication in the Federal Register on September 4, 2008. The notice formally announced the agency's existence and authority to act. Source: https://en.wikipedia.org/wiki/Federal_Housing_Finance_Agency

[3] The Office of Federal Housing Enterprise Oversight (OFHEO) was an agency within the Department of Housing and Urban Development of the United States of America. It was charged with ensuring the capital adequacy and financial safety and soundness of two government sponsored enterprises—the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). It was established by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992. Source: https://en.wikipedia.org/wiki/Office_of_Federal_Housing_Enterprise_Oversight

- February 8, 2004, Audit Manager in FHFB OIG.
- September 18, 2005, Audit Director in FHFB OIG.
- October 24,2010, Audit Director in FHFA Office of Internal Audit (OIA). OIA reported directly to then FHFA Director James Lockhart.
- January 11, 2011, OIA transferred from FHFA Office of Internal Audit to newly created FHFA OIG as Management Analyst.
- March 28, 2011, transferred from FHFA OIG to FHFA Office of Chief Accountant (OCA), as Principal Accounting Examiner.
- May 2012 to current, served in various positions within FHFA, including Audit Liaison, Management Advisor, Principal Risk Specialist, and Principal Risk Analyst.

6.      Plaintiff has had a long and distinguished career as a Certified Public Accountant and

Auditor. He graduated from Virginia Tech with a Bachelor of Science in Finance in 1980, and

received an Associate of Applied Science in Accounting in 1984 from Northern Virginia

Community College.

7.      Mr. Plaintiff also holds a master's degree in Computer Systems Management from the

University of Maryland University College (1999).[4]

8.      Additionally, Mr. Plaintiff has received the following certifications:

- Accredited Mortgage Professional (AMP)
- Certified Acquisition Professional (CAP)
- Certified Electronic Evidence Collection Specialist (CEECS)
- Certified Information System Auditor (CISA)
- Certified Information Systems Security Professional (CISSP)
- Certified Public Accountant (CPA)
- International Certificate in Banking Risk and Regulation (ICBRR)

9.      Prior to being hired by FHFA (previously named the Federal Housing Finance Board) in

2004 he worked at the Office of the Inspector General, Housing and Urban Development from

---

4 The name "University of Maryland University College" was changed to "University of Maryland Global Campus" on July 1, 2019. Source: https://en.wikipedia.org/wiki/University_of_Maryland_Global_Campus

2000-2004; Defense Contract Audit Agency from 1986-2000; and, various banks between 1980-1986 as a management trainee, staff accountant and staff auditor.

10.     Prior to his temporary detail under Joyce Plaintiff always received strong and positive job performance reviews, his peers and supervisors viewed him as a trusted and capable colleague, and he always carried out his assignments in a professional and competent manner.

11.     In addition, Mr. Plaintiff regularly worked with and assisted in training many younger employees over his professional career at each of his employers, including at the Agency.

     a.  Plaintiff worked at the FHFA during a period when the Agency was under intense public and Congressional scrutiny for failing to properly carry out its oversight responsibilities of the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie") and the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and was familiar with the Agency's numerous problems as he served in the Agency's Office of the Inspector General ("OIG") as a Management Analyst in 2011 and Audit Manager in 2004 and Audit Director from 2005-2010 in the FHFB OIG, and FHFA OIA.

     b.  Plaintiff's assignment to work under the supervision of Ellen Joyce was determined by Nina Nichols as a result of a request for additional staff by Joyce and an agreement by Golden, Plaintiff's then current supervisor, to facilitate Plaintiff's temporary transfer of position.

     c.  Prior to starting work under Joyce, Plaintiff was aware that the section of the Agency to which he was being detailed had a long history of problems stemming from Freddie Mac's refusal to improve its audit workpaper systems and the resulting

4

problem that work papers needed for oversight were frequently delayed or not
available to the FHFA examiners.

    d.  Plaintiff had brought these problems to the attention of the Agency during his first
assignment in that group more than 5 years prior to the date of his detail under Joyce.

12.    Defendant FHFA is located in the District of Columbia. Defendant employs more than
700 employees and is an employer subject to the Age Discrimination in Employment Act
of 1967 ("ADEA").

13.    Defendant Mark A. Calabria is the current Director of the FHFA. He is a Senate
Confirmed Presidential Appointee and has responsibility to direct and oversee all aspects
of the operation of FHFA, including, but not limited to, employment practices, policies,
and operations.

14.    Annie Golden was at all times relevant to this complaint was an agent of the FHFA and
Supervisory Risk Analyst and Plaintiff's direct report supervisor prior to the temporary
detail to work under Joyce.

15.    Marie Harte was at all times relevant to this complaint an agent of the FHFA and
Supervisory HR Specialist/Deputy Director, Office of Human Resources Management.
Ms. Harte was involved in the Reprimand process against Mr. Plaintiff.

16.    Ellen Joyce was at all times relevant to this complaint an agent of the FHFA and Acting
Supervisor of the OCA Internal Audit Branch at the Agency. In this position Joyce served
as Plaintiff's direct report supervisor.

17.    Michael Lee was at all times relevant to this complaint an agent of the FHFA and
Associate Director of the Office of Risk and Policy ("ORP"). At the conclusion of
Plaintiff's temporary detail to work under Joyce he was assigned to work in the Market

Risk Branch of the Office of Risk and Policy under Art Hogan. He has never been

reassigned back to his original position in the Operational Risk Branch under Annie

Golden.

18.     Nina Nichols was at all times relevant to this complaint an agent of the FHFA and

Deputy Director of the Division of Enterprise Regulation and had supervisory control

over Michael Lee, Ellen Joyce, Marie Harte, and Annie Golden. Nichols reported directly

to Mark Calabria or the Agency Director during all times relevant to this complaint.

## II.     JURISDICTION AND VENUE

19.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C.

§1343(4) as the action is brought under the ADEA, 29 U.S.C. § 621 *et seq.* and

supplemental jurisdiction over Counts II and IV pursuant to 28 U. S. C. §1367 because the

claims under D.C. Code Sec. 2-1401.01 *et seq.*, arise from a common set of operative

facts and are so related to the claims in the action within the original jurisdiction of the

Court that they form part of the same case or controversy.

20.     Plaintiff has exhausted his administrative remedies with respect to this claim.

21.     On or about July 30, 2018, Plaintiff filed an age discrimination complaint alleging a

violation of the ADEA with the Equal Employment Opportunity Commission ("EEOC").

Said complaint was designated as FHFA-DER-0006-2018.

22.     The complaint was investigated by an Agency EEO Investigator and a *Report of*

*Investigation* ("ROI") prepared and provided to the Agency and Plaintiff. All documents

cited to within this Complaint are contained in the ROI and include the ROI pagination.

Only necessary portions of the ROI that runs in excess of nine hundred pages and are

essential to determination of the action are attached as required under the District's Local Rule, LCvR 5.1(e).

23. On February 26, 2020 the EEOC dismissed the Plaintiff's hearing request for issuance of an Agency final decision upon Plaintiff's motion to file a complaint in federal district court. Plaintiff commenced this action pursuant to *The Age Discrimination in Employment Act of 1967,* 29 U.S.C. §621 *et seq.*

24. Venue is proper in this District pursuant to 28 U.S.C.§1391(b), because all of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Columbia.

## III.   FACTUAL BACKGROUND

A.   **Plaintiff's ability in 2018 to identify FHFA's current failures as a substantial and specific danger to the public's financial safety comes from his experience at FHFA's since 2004.**

25. FHFA's mission is to promote their safety and soundness, support housing finance and affordable housing goals and facilitate a stable and liquid mortgage market.

26. The Housing and Economic Recovery Act of 2008 that established FHFA as regulator also tasked the Agency to perform regular and substantive examinations of Freddie and Fannie.

27. The Job of the OCA is to:

  a.   Provide the government enterprises it regulates with an authoritative resource for accounting, auditing, and financial disclosure matters;

  b.   provide accounting and auditing expertise and supervision support regarding all FHFA-regulated entities as well as for conservatorship activities. OCA leads and supports reviews and examinations of Accounting governance; Internal Control

over Financial Reporting; Internal Audit, External Audit; and adherence to FHFA accounting guidance;

c. review and examine results to DER and DBR Examination Teams to inform risk assessments and Reports of Examination;

d. review and assess regulated entities' critical and significant accounting policies and estimates and updates thereto for consistency with Generally Accepted Accounting Principles (GAAP) and *safety and soundness guidance*; and

e.  monitor and participate in accounting and auditing *standard-setting activities* and collaborate with other federal financial regulators to further FHFA's mission.

28. As a senior accountant at the Agency Plaintiff had the right and responsibility to raise any and all issues that he believed raised questions regarding the Agency's critical mission and purpose.

29. Plaintiff's employment at FHFA and its predecessor agency the FHFB since 2004, provided him with the experience and knowledge of the FHFA's weaknesses, the weaknesses of the mortgage Enterprises it regulated, and what critical infrastructure deficiencies created significant risk of regulatory failure.

30. Plaintiff was aware that "[a]s of March 31, 2011, the enterprise's unregulated actions had resulted in the Treasury Department's investment of almost $154 billion in an effort to stabilize their operations and the mortgage market generally. *See* FHFA OIG's Audit of the Federal Housing Finance Agency's Consumer Complaints Process, AUD-2011-001, dated 06/21/2011, page 2, available at: https://www.fhfaoig.gov/Content/Files/AUD-2011-001.pdf.

31. The Federal Reserve also took steps to support the Enterprises, such as committing to purchase up to $1.25 trillion of their securities.

32. Contrary to Joyce's criticism of Plaintiff and the retaliatory Reprimand, Plaintiff's repeated disclosures and statements regarding problems with internal audit workpaper systems at Freddie that were relied upon by at least 15 different FHFA examination groups, including four of Satriano's OCA teams was not an effort to dwell on long resolved issues, but rather long-standing issues that had not been resolved even though Plaintiff had identified them to the Agency approximately five years before.

**B.      Plaintiff had observed significant problems in FHFA's operations during his first assignment to the Office of the Chief Accountant in 2011.**

33. During Plaintiff's first posting to the Office of the Chief Accountant ("OCA") in 2011, Nick Satriano tasked Plaintiff with reviewing OCA operations to determine weaknesses in work process.

34. Plaintiff had been assigned to the Office of the Inspector General ("OIG") immediately before joining the OCA and accordingly had the expertise and training to review operations to identify failures and areas of focus by FHFA management.

35. During the review of OCA operations, the most significant matter Plaintiff recognized involved improper data and document management and storage within the Office.

36. Once Plaintiff completed the assignment he produced a memorandum documenting weaknesses that included a recommendation for a work paper management system (work papers are those documents used by an examiner in performing and documenting their review).

37. Such a system would, by necessity, allow FHFA examiners to see the actual work papers contained in the Enterprise agency computers that it was responsible for regulating and that the Enterprise used.

**C.      Nearly seven years later in 2018, Plaintiff was again assigned to the OCA to assist Ellen Joyce's Group and he recognized a number of the same types of problems in OCA that he had reported in 2011.**

38. On information and belief in or about January of 2018, Ellen Joyce, the Acting Supervisor  of the FHFA's Audit Branch within the Office of the Chief Accountant ("OCA") engaged in a discussion with Amy Golden, a Supervisory Risk Analyst in the Operational Risk and Policy and Plaintiff's boss about the possibility of temporarily detailing Plaintiff to Joyce's Branch.

39. At the time of the detail, Plaintiff was a top performer within Golden's group, had managed employees and projects in different offices within the Agency, was over sixty years of age, and had experience in addressing agency-wide technology issues that had a direct impact on the ability of the Agency to carry out its mission.

40. Instead of detailing a less experienced employee to Joyce's group who could still do the work, Plaintiff was pressured with the argument that he was greatly appreciated and his experience and prior work made him a valuable addition to a team of employees that was poorly staffed.

41. Based on information and belief, defendants Nichols, Golden, and Joyce intentionally worked to push Plaintiff to accept work that was substantially below his capabilities in order to make his work assignment significantly less interesting, demanding, and worthwhile to encourage him to leave the agency.

42. Based on information and belief, Nichols, Golden, and Joyce were all aware that given the problems in Joyce's group and the deficient computer workstations, it was unlikely that Plaintiff would succeed in his assignment and could be disciplined or pushed out of the Agency due to poor performance reviews or changed working conditions.

43. Based on information and belief, Joyce did not hold younger employees to the same standards as she held Plaintiff even though Plaintiff and younger employees were both hindered in their work because of the same workstation problems that were outside their control.

44. On information and belief, other older employees were also detailed to other assignments with praise for their abilities only to find themselves pushed out of the Agency shortly after the change in their assignments.

45. Joyce requested the temporary detail of Plaintiff into her Group.

46. On or about January 17, 2018, Plaintiff and Golden met to discuss Plaintiff's detail to the Office of the Chief Accountant, Audit Branch on two occasions.

47. Plaintiff provided information about his prior posting to the Audit Branch in the OCA approximately five years before.

48. Plaintiff informed Golden about numerous concerns and clearly expressed his desire not to be detailed.

49. Golden referred Plaintiff to Joyce to discuss his reservations and he did so on or about January 17, 2018.

50. Plaintiff's meeting with Joyce did not resolve his concerns and upon communicating his continuing concerns to Golden, Golden suggested a meeting with Nichols.

51. On or about January 17, 2018 Golden and Plaintiff attended a meeting with Nichols in a further attempt to resolve Plaintiff's concerns.

52. During the meeting with Nichols, Nichols attempted to put Plaintiff at ease by highlighting staff changes that had been made and that as a result of those changes previous problems had been addressed.

53. Nichols also stressed that the work that Plaintiff would assist with was important and needed someone with his experience.

54. In response to the continued demand by Nichols that Plaintiff take the detail and Plaintiff's desire to be a "team player" Plaintiff acquiesced to Nichols's direct request to accept the detail and Plaintiff joined Joyce's group on or about February 18, 2018.

**D.      After the first meeting of Joyce's Group attended by Plaintiff Joyce sours on Plaintiff and assumes that as an older employee Plaintiff would be difficult to control and unwilling to ignore current problems with the office.**

55. On or about February 22, 2018 Plaintiff attended his first staff meeting with Joyce's group.

56. In attendance were Joyce, Plaintiff, and her subordinates Christopher Yfantis, Benjamin Gill, Nathan Tenor, and Michael Zheng to discuss specific tasks and work to be done.

57. Notwithstanding that Mr. Plaintiff's skillset and background, including the fact that he was a licensed CPA, were specifically cited by Defendants Nichols and Golden in detailing him to the Audit Branch and that Joyce had encouraged Plaintiff prior to starting work in her group that he should consider providing input and information to Joyce's other employees who were relatively inexperienced, when he did so he was immediately castigated by Joyce.

58.  Immediately following the February 22, 2018 meeting Joyce asked Plaintiff to remain behind after the other employees left to talk.

59. Joyce accused Plaintiff of having offended someone during the meeting, but did not identify the individual allegedly offended.

60. Joyce accused Plaintiff of inappropriate and irrelevant comments that dealt with management decisions and actions made "years" before.

61. Joyce accused Plaintiff of improperly communicating during the meeting with a raised voice and appearance of anger.

62. Plaintiff immediately corrected the record and informed Joyce that he was not angry and that while he did not display a docile acceptance of Joyce's characterization, he was direct and forceful in identifying deficiencies in management.

63. After the conversation in which Joyce made her baseless allegations, Plaintiff sought out each of the Branch's employees that were present in the meeting to see if any apology or clarification was necessary and each individual informed Plaintiff that they did not view him as being angry during the meeting.

64. Joyce's own notes of conversations that she initiated and held with the four other staff present at the February 22, 2018 meeting do not record any individual commenting that Plaintiff was angry or took offense. *See* Reprimand, *Jay Jacobsen Detail Notes*, ROI at 83-84 (Attached as Exhibit A).

65. During the February 22, 2018 meeting Plaintiff, based on his experience and knowledge of the work Joyce's group was responsible for and the troubled data system upon which they would be dependent, expressed his opinion that additional staff were needed and he asked whether staff from the Accounting Policy Branch ("Policy") could be assigned to assist Joyce's group.

66. On or about February 26, 2018, Robert Rispler, Supervisory Accountant, Accounting Policy Branch, confronted Plaintiff seeking a "clarifi[cation] [of] comments he had been told Plaintiff made the previous day during a staff meeting he attended with [Joyce] and staff." *See* Statement of Robert Rispler, EEO Report of Investigation ("ROI"), p. 0443-5, (Attached as Exhibit B).

13

67. Rispler believed that it was improper for Plaintiff to offer an opinion that Rispler's Branch was underutilized at that time and that they could be more use working for Joyce without jeopardizing their mission. During the discussion between Plaintiff and Rispler, Rispler took an adversarial position to that of Plaintiff's position and demanded that Plaintiff apologize for being critical of Rispler's group.

68. When Plaintiff defended his right to make recommendations involving another group without consulting that group's supervisor and did not apologize as Rispler expected, Rispler complained to Joyce that Plaintiff "became quite aggressive." *See* Reprimand, Attachment 2 (Attached as Exhibit A, ROI at 85).

69. Plaintiff did not become aggressive at any point in the discussion between himself and Rispler, however, Plaintiff did ask for more specific information about the basis for Rispler's accusation and the source of the information about Plaintiff so that he could address the errors in what Rispler had been told.

70. Plaintiff's experience working for the Agency gave him substantial exposure to both high and low performing managers.

71. At all times relative to this complaint, Plaintiff believed that Nichols was a strong supporter of Plaintiff and his skills and Plaintiff had no motive to malign or otherwise negatively critique Nichols.

72. Rispler claimed Plaintiff defended his position by accusing Nichols of incompetence.

73. Rispler created an email complaint and record of his self-serving confrontation and sent it to Ellen Joyce on February 27, 2018 at 8:48 a.m., accusing Plaintiff of misconduct and anger with an offer to Joyce: "let me know if you would like to discuss." *See* Rispler email to Joyce, February 27, 2018, (Attached as Exhibit A, ROI at 85).

74. Upon information and belief, such records as created by Rispler are understood by federal managers to be required in creating a justification to discipline or fire an employee or to rate an employee's job performance at a level of less than fully successful. *See* Federal Housing Finance Agency, Conduct and Discipline Policy, at 1-3 (Attached as Exhibit C, ROI at 859-861); *see also,* Federal Housing Finance Agency, Performance Management Policy, at 4-6 (Attached as Exhibit D, ROI at 867-869).

75. Rispler did not request permission from Joyce, Plaintiff's supervisor, prior to speaking with him or inform Plaintiff that he would be generating a complaint to Joyce, he simply confronted Plaintiff, reprimanded him orally, and then when Plaintiff did not submit and agree with Rispler's statements, Rispler created a complaint that he knew could be used as a basis for discipline or in determining his job performance rating.

76. Despite Joyce receiving the email from Rispler on February 27, 2018, Joyce did not discuss this matter with Plaintiff until Joyce issued the Reprimand to Plaintiff on May 3, 2018.

77. On or about March 22, 2018 Plaintiff was involved in a meeting with Chris Yfantis and Suzanne Crump.

78. Crump was "assigned to an oversight role for OCA's Workpaper evaluations (targeted exams of FRE [Freddie Mac] and FNM [Fannie Mae], a project for which Jay was assigned to work while on his detail to OCA." *See* Statement of Suzanne Crump (Attached as Exhibit E, ROI at 420).

79. In the meeting with Crump and Yfantis, Mr. Yfantis explained that computer problems were holding up the audit workpapers and that as a result completion of audit tasks could be delayed.

80. The computer problems Yfantis described occurring in 2018 were the "same problem[s] [Plaintiff] encountered six years ago in the agency." *See* Statement of Plaintiff, ROI at 149, 157-8 ("Plaintiff Statement" Attached as Exhibit F). Additionally, in an OCA meeting later with all OCA teams present, Mr. Yfantis indicated that audit workstation issues at Freddie Mac existed for approximately eight years.

81. As a result of this information Plaintiff "expressed annoyance with the fact that the computer issues were impeding [his] and others' ability to perform [their] audits." Plaintiff Statement, Exhibit F, ROI p.158.

82. Crump, while denying any responsibility for the computer problems and failing to understand the gravamen of Plaintiff's observations rejected them out of hand, calling them, "long-past", "unrelated" to the issues at hand, and irrelevant. Plaintiff Statement, Exhibit F, ROI p.158.

83. On or about April 5, 2018 Yfantis failed to provide Plaintiff with a hyper-link to allow Plaintiff to access work papers that he needed to complete an assignment and had asked for on two prior occasions on or about March 13 and 14, 2018 by email and once in person.

84. This delay in obtaining work papers jeopardized Plaintiff's ability to complete his work on schedule and when Plaintiff asked him in person, Yfantis blamed the inability to obtain the work papers on computer problems.

85. Plaintiff brought the failure of Yfantis's to support him to Joyce's attention and she responded, "by saying she was aware of Mr. Yfantis' issues—and later forwarded the hyperlink herself." *See* Plaintiff Statement, Exhibit F, ROI pgs. 159-60.

86. Joyce overlooked Yfantis's failure to perform his work and based on information and belief did not issue a verbal or written reprimand or counsel him orally, instead she performed his work herself.

87. On or about April 12, 2018 Plaintiff met alone with Ms. Crump in a productive meeting that
    lasted about forty minutes and was also joined by Mr. Yfantis near the end of the meeting.
    Plaintiff Statement, Exhibit F, ROI p.158.

**E.     Joyce begins her campaign to undermine Plaintiff's reputation by soliciting
complaints about Plaintiff as she assumes that as an older employee with substantial
experience he will expose deficiencies in her Group and the OCA and must be discredited
as angry and unprofessional.**

88. Based on information and belief, Joyce proactively sought out negative and derogatory
    comments about Plaintiff that would not have been generated but for Joyce's efforts actions
    that she did not, based on information and belief, undertake against her younger employees.

89. Ellen Joyce provided a written statement to the FHFA EEO Investigator on or about October
    11, 2018 under penalty of perjury. *See* Statement of Ellen Joyce (Attached as Exhibit G)

90. Ellen Joyce provided statements to the FHFA EEO Investigator that she believed justified her
    issuance of a written reprimand.

91. Ellen Joyce engaged in a pattern of vindictive actions to generate complaints against Plaintiff
    and make it difficult for him to continue his employment at the Agency by prejudicing others
    against Plaintiff.

92. In her written statement, Joyce included a document she entitled, *Review for Jay Plaintiff for
    OCA Work Paper Evaluation-May 14, 2018* ("*Review*") that she stated she provided to Mr.
    Plaintiff's new manager on his work performance." *See* Exhibit G, ROI pgs.416-17, *see also,*
    Statement of Ellen Joyce, Exhibit G, ROI p.411).

93. On information and belief, Joyce did not write the *Review*, but requested that her subordinate Suzanne Crump create a document intended to prejudice Plaintiff in the eyes of his new manager.

94. Crump created the document which she entitled, *Work Review Sent to Manager Ellen Joyce on May 11, 2018.  See* Statement of Suzanne Crump, ROI p.425 (Attached as Exhibit E).

95. Joyce also asked other subordinates to create written complaints to justify taking a personnel action against Plaintiff.

96. Joyce asked Yfantis to provide a written account on or about April 11, 2018 disparaging Plaintiff over issues involving anger and a lack of professionalism.

97.  Upon information and belief, Yfantis is thirty-five (35) years old, more than six feet in height, did not fear Plaintiff, and did not initiate any complaint against Plaintiff with Joyce.

98. At the time of the conversation, Plaintiff was sixty-years old and approximately 5 foot, 9 inches tall and did not pose a physical threat to Yfantis.

99. On or about April 19, 2018, Joyce requested that Marie Harte accompany her to a meeting with Plaintiff at which time she intended to surprise and confront Plaintiff with a host of complaints that she had previously solicited.

100.    The April 19, 2018 meeting was scheduled as a routine weekly work review meeting between Joyce and Plaintiff.

101.    Plaintiff was surprised by the presence of Harte when he arrived at the meeting and was not prepared to defend himself from accusations leveled by unidentified staff.

102.    Joyce failed to provide Plaintiff advance notice of either the changed purpose of the meeting or the accusations against him so that, notwithstanding the fact that this was Plaintiff's one opportunity to "present his side of the stories, his perspective on what

happened, and, in short, his defense, denial, or mitigating circumstances related to the allegations." *See* Statement of Marie Harte ROI p. 438 ("Harte Statement") (Attached as Exhibit I)

103.    During the April 19, 2018 meeting Joyce dismissed as irrelevant Plaintiff's attempt to explain his position, mindset, and concerns that frustrated him, calling them "events from years before," making Plaintiff feel as if he was seen too old and focused only on the past. *See* Reprimand, Exhibit A, ROI p.79.

104.    On or about November 5, 2018, Michael Lee, Associate Director and Plaintiff's supervisor after leaving Joyce's group, provided a written statement to the FHFA EEO Investigator under penalty of perjury.

105.    Lee stated that he did not observe that Plaintiff would benefit from anger management training in any way.

106.     Lee further stated that since Plaintiff had been under his supervision, he had not observed that Plaintiff appeared angry, agitated, or raised his voice in the workplace.

107.    Lee also stated that there was nothing that he specifically remembered of the pejorative comments made by Joyce during several meetings with Lee.

108.    Several days after the February 22, 2018 meeting, Joyce initiated contact with her subordinate, Nathan Tenor to talk about Plaintiff.

109.    Although Tenor had not complained to Joyce or made any comments to Joyce about Plaintiff, Tenor admitted in answer to a question posed by the FHFA EEO Investigator that Joyce asked him a few clarifying questions about what he observed and thanked him for sharing this information with her.

110.    Based on information and belief, Tenor did not file an oral or written complaint with

Joyce or complain about Plaintiff's demeanor at the meeting.

111.    Based on information and belief, Tenor's only comments to Joyce about Plaintiff's

demeanor were made at her request several days after the meeting.

112.    Joyce thanked Tenor after he had expanded his comments and agreed with Joyce's

version of what took place in the meeting.

113.    On or about October 25, 2018, Benjamin Gill, a member of Joyce's team and present

during the February 22, 2018 meeting provided a written statement to the FHFA EEO

Investigator.

114.    Based on information and belief, in answer to questions about his observations regarding

Plaintiff's exhibition of anger during the February 22, 2018 meeting, Gill stated that he did

not observe that Plaintiff appeared or acted in an angry or agitated fashion.

115.    Gill also stated that he has never observed Plaintiff to be angry, agitated, to raise his

voice, and/or to behave unprofessionally in the workplace.

116.    On or about November 11, 2018 Michael Zheng, provide a written statement to the

FHFA EEO Investigator.

117.    Michael Zheng attended the February 22, 2018 meeting of Joyce's group, but did not

report any concerns to Joyce about Plaintiff's behavior, fear for his safety, or inability to

work with Plaintiff.

118.    Based on information and belief, Michael Zheng stated to the Investigator that he did not

ever observe Plaintiff to be angry, agitated, to raise his voice, and/or behave unprofessionally

in the workplace after the February 22, 2018 meeting at which he claims Plaintiff act in an

unprofessional manner by becoming slightly agitated during his discussion of the regulated entities' Sarbanes Oxley practices and raising his voice.

119.    Upon information and belief, Joyce and Crump refused to respect Plaintiff's expertise and refused to accept Plaintiff's observations and analysis because his analysis called out management failures that they did not want to hear.

120.    That Joyce and Crump treated Plaintiff differently from other subordinate employees by constantly referring to any criticism they did not want to hear as old, no longer relevant, from years ago, and the agitation of an old employee that they determined to inflict reputational harm upon and retaliate against because he would not ignore significant failings that could result in significant financial harm to the regulated entities and the taxpayer.


**F.    Joyce's failure to adhere to the disciplinary process during her April 19, 2018 meeting with Plaintiff denied him protections under the Agency's *Conduct and Discipline Policy,* harmed Plaintiff's ability to defend himself, avoid unwarranted discipline, and stop Joyce's treatment of him as a useless old member of her Group.**

121.    On or about April 19, 2018, Plaintiff was scheduled to meet with Joyce for Plaintiff's weekly status meeting to discuss work.

122.    When Plaintiff arrived for the meeting he was surprised to find that Marie Harte, a representative of the Human Resources Office was also present.

123.    Plaintiff had no notice that the weekly status meeting was now an inquisition in which, without any notice, Joyce expected Plaintiff to be prepared to offer evidence to "dispute the reports of your angry and agitated behavior." Reprimand (Exhibit A, ROI p.79).

124.    According to Joyce, the purpose of the April 19, 2018 meeting "was held to obtain
Plaintiff's side of the story with regard to the statements provided by other employees about
his behavior." *See* Statement of Ellen Joyce, ROI p.413 (Attached as Exhibit G).

125.    When Plaintiff attempted to provide context for his response Joyce dismissed his answers
as unresponsive and focused on "people and issues from five years ago… ." *See* Reprimand,
ROI p.79.

126.    Joyce refused to identify the source of the complaint when asked by Plaintiff.

127.    Joyce refused to consider Plaintiff's prior experiences as relevant, disparaging his long
tenure and experience at the Agency as meaningful or able to provide useful information to
her as the Proposing Official (proposing officials recommend discipline action based on
personal knowledge, receipt of an investigative report, or other documentation concerning
conduct of an employee). *See* Reprimand, ROI p.79; *see also,* Agency Conduct and
Discipline Policy, Exhibit E, ROI p.859.

128.    Joyce refused to credit Plaintiff's meeting when Plaintiff tried to explain the basis for his
frustration, Joyce claimed that Plaintiff "provided nothing in the April 19th meeting to
convince me that you did not behave inappropriately" because he "focused on events from
years before," and that she did not believe that the "information [Plaintiff] was providing was
essential to [Joyce] [and] [Harte] understanding what happened." Reprimand, ROI p.79.

129.    Joyce characterized Plaintiff's answers as an "entire focus … upon the incidents from
long ago." Reprimand, ROI p.79.

130.    In spite of Joyce's total disregard for Plaintiff's positions or statements, Joyce admits that
Plaintiff provided relevant information during the April 19, 2018 as he attempted to explain

the basis for his frustration, information Plaintiff offered in defense against the largely

anonymous complaints with which Joyce confronted him. *See* Reprimand, ROI p.79.

131.    Under the FHFA *Conduct and Discipline Policy*, Joyce was authorized to correct minor

misconduct without taking disciplinary action. *See* Exhibit C, *Conduct and Discipline Policy,*

ROI p. 860.

132.    If Joyce chose to avoid taking disciplinary action she was authorized to employ

*Counseling*, either oral or written.

133.    If Joyce chose to engage in oral counseling, "[n]o record of oral counseling is kept in the

employee's official personnel folder." *Conduct and Discipline Policy,* ROI p.861.

134.    If Joyce chose to engage in written counseling because in her mind the oral counseling

had failed to correct the behavior she was authorized to issue written counseling, however,

"no record of the counseling is kept in the employee's [official] [personnel] [folder]

("OPF")". *Conduct and Discipline Policy,* ROI p.861.

135.    If Joyce chose to impose formal discipline she was authorized to issue a Reprimand,

however, it must be written, can remain in the OPF for up to two years, and can be used in

the future to support "more severe action, up to and including removal from federal service."

*Conduct and Discipline Policy,* ROI p.861.

136.    The *Conduct and Discipline Policy* did not authorize Joyce or the Agency's Human

Resources Office as then represented by Marie Harte, to conduct an impromptu inquisition of

Plaintiff for the purpose of inviting him to testify and defend himself against anonymous

allegations made against him without notice or the ability to read and know the source of the

evidence against him.

137.    When Plaintiff attempted to provide context for his response Joyce dismissed his answers

as unresponsive and focused on "people and issues from five years ago… ." *See* Reprimand,

ROI p.79.

**G.      The Reprimand issued by Joyce contains numerous discriminatory and disparaging references to Plaintiff's age and corroborates Joyce's focus on Plaintiff's age rather than his concerns about Agency management and problems with the Agency's operations.**

138.    Joyce refused to consider Plaintiff's prior experiences as relevant, disparaging his long

tenure and experience at the Agency as meaningful or able to provide useful information to

her as the Proposing Official (proposing officials recommend discipline action based on

personal knowledge, receipt of an investigative report, or other documentation concerning

conduct of an employee). *See* Exhibit A, ROI p.79; *see also,* Agency Conduct and Discipline

Policy, Exhibit C, ROI p.859.

139.    Though Joyce refused to consider the substance of Plaintiff's complaints at any time

during his detail, viewing them merely as old news, in fact, Plaintiff's frustrations concerned

current and ongoing problems that Joyce was forced to admit kept Plaintiff from being able

to finish tasks on time. *See Review for Jay Jacobsen for OCA Work Paper Evaluations-May

14, 2018* (Exhibit H, ROI p.425)*.

140.    Upon information and belief, Joyce refused to credit Plaintiff's complaints and engaged

in a pattern of reprisals, retaliation, and recrimination in order to damage his reputation and

thereby undermine any legitimate criticisms Plaintiff was making about Joyce, Agency

leadership, or work paper computer system problems.

141.    Though Joyce admitted in the Reprimand that Plaintiff had provided relevant information

in that Plaintiff tried to explain the basis for his frustration, Joyce claimed that overall,

Plaintiff "provided nothing in the April 19th meeting to convince me that you did not behave inappropriately" because he "focused on events from years before," and that she did not believe that the "information [Plaintiff] was providing was essential to [Joyce] [and] [Harte] understanding what happened." Exhibit A, ROI p.79.

142.    Joyce characterized Plaintiff's answers in the Reprimand as an "entire focus … upon the incidents from long ago." Exhibit A, ROI p.79.

143.    Joyce was also aware at the time she issued the Reprimand that Plaintiff had "over thirty years of federal experience and no record of discipline or performance problems" and was part of the protected class under the ADEA. Exhibit A, ROI p.81.

144.    Upon information and belief, the Reprimand omits any mention of Plaintiff's criticisms and observations of management failures and operational deficits, describing them as irrelevant in order to protect management and prevent the creation of a written management record documenting defective computer workstations.

145.    The Reprimand describes Plaintiff as stuck in the past and exhibits a bias against Plaintiff's age by discrediting his observations and characterizing his experience as irrelevant, old, and of no current use.

146.    The result was that Plaintiff felt that he was being treated as an employee who was too old to contribute and no longer offering anything of current value to the Agency even though the statements and comments that Joyce refused to address were referred to problems that as occurred in the early 2000s could easily harm the enterprises being monitored to the financial harm of the taxpayer.

**H.    Joyce engaged in a campaign of retaliation against Plaintiff.**

147.    Upon information and belief, Joyce disapproved of Plaintiff's efforts to call to her attention problems with staffing and the work paper computer system.

148.    At the conclusion of the February 22, 2018 meeting Joyce attempted to put a stop to any criticisms that Plaintiff may have about the Agency during what she characterized as "verbal counseling". Exhibit A, ROI p.77.

149.    Plaintiff was shocked that his comments might have been interpreted or received as characterized by Joyce and he proactively met with each colleague following the meeting to rectify the situation, but each colleague reassured him that they were not offended and did not interpret his comments as Joyce had described to Plaintiff.

150.    Plaintiff informed Joyce that he had checked with his new colleagues and they were not offended and did not interpret him as angry.

151.    Joyce then initiated an effort to solicit negative comments about Plaintiff's behavior from her subordinates as Plaintiff refused to accept Joyce's characterization during her verbal counseling.

152.    Upon information and belief, shortly after the February 22, 2018 meeting, Joyce or a member of Joyce's team communicated with Defendant Rispler about comments Plaintiff made regarding requesting staffing assistance from Rispler's group.

153.    Upon information and belief, Rispler is told that Joyce believes it necessary to discipline Plaintiff and Rispler confronts Plaintiff in person, challenges Plaintiff's ability to comment on management issues, and prepares a written complaint to Joyce that he had reason to know could be used as a basis to issue an oral or written reprimand to Plaintiff.

154.    Rispler does not admit talking with Plaintiff's supervisor Joyce prior to confronting him

and requesting an apology from Plaintiff for comments, the substance of which, Plaintiff

denies making.

155.    Nevertheless, on or about February 27, 2018, Rispler sends Joyce an email that purports

not only to document the confrontation, but adopts the approach Joyce used to discredit

Plaintiff, that of an angry old man, describing him as quite aggressive. *See* Exhibit A, ROI

p.85.

156.    On April 19, 2018 Joyce and Harte confront Plaintiff without providing him notice of the

changed purpose of Plaintiff and Harte's regularly scheduled meeting and Plaintiff refuses to

accept the characterization of his behavior and actions proffered by Joyce on the basis that

his conduct is protected and required of Plaintiff given his position as a senior Agency

accountant, he was not angry, and did not act in a menacing way towards Joyce. *See* Informal

Grievance in Response to May 3, 3018 Letter of Reprimand, May 18, 2018, ROI pgs. 817-18

(Attached as Exhibit I).

157.    Upon information and belief, Joyce stereotyped Plaintiff as an older employee who

would be difficult to control and living in the past rather than as an experienced employee

with significant and current complaints about the Agency who was passionate about his

work.

158.    At every opportunity Plaintiff attempted to explain to Joyce and Crump that his concerns

were not ancient, but rather timely and current as they created the same types of problems

that he had seen when previously assigned to the OCA and that had caused the Agency and

its regulated enterprises significant problems only to be rebuffed, disparaged as living in the

past, and unable to offer anything of value given his age except recalling long past problems.

159.    As a result of those stereotypes, Joyce continued her attempt to discredit and damage

Plaintiff's standing in the Agency by attempting to prejudice Plaintiff's next supervisor

against him once the detail to Joyce's group ended in May of 2018.

160.    On or about May 14, 2018 Joyce provided a memorandum to Michael J. Lee in which she

characterized his work negatively.

161.    On or about May 14, 2018 Joyce also recommended to Lee that he recommend to

Plaintiff that he take anger management training.

162.    During the detail with Lee's group Lee testified that he did not observe Plaintiff appear

angry, agitated, or raising his voice in the workplace. *See* Statement of Michael Lee to FHFA

EEO Investigator, July 30, 2018,  ROI p.449 (Attached as Exhibit J).

163.    On July 30, 2018, in answer to a question from the FHFA EEO Investigator, Lee stated

that "[s]ince [Plaintiff] has been under [my] supervision, [I] have [not] observed that

[Plaintiff] might benefit from anger management training in any way." Exhibit J, at 449.

## COUNT ONE

## UNLAWFUL AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMIATION IN EMPLOYMENT ACT, 29 U.S.C. §621 *et seq.*

164.   Based on the foregoing paragraphs, Defendants discriminated against Plaintiff because of his age in violation of Title 29 U.S.C. §621 *et seq.*.

165.   Plaintiff was 60 years of age and a member of a protected class when he learned that Defendants decided to detail him to a work group that he was told he was well suited to assist due to his experience and knowledge.

166.   Defendants then ignored, ridiculed, and criticized him when he made observations that he believed were relevant and dated back to problems he had first observed approximately five years before.

167.   Defendant's managers and supervisors criticized Plaintiff on the basis that his observations and concerns were old, involved matters from years ago, and, by implication need not be treated seriously as the rants of an old employee even when they impacted Plaintiff's current ability to complete work tasks and exposed the Agency to risk.

168.   Joyce and Crump engaged in a pattern of activity intended to drive Plaintiff, an older employee about whom they harbored improper biases and stereotypes tied to his age, out of the agency by significantly impacting his working conditions, subjecting him to improper discipline, disparaging his professional reputation and personal character, creating a false behavioral history and setting him up to receive poor performance ratings.

169.   Defendants through Joyce and Crump knowingly discriminated against Plaintiff with knowledge of Plaintiff's age and created a behavioral record as a pretense to cover up their belief that as an older employee he would not acquiesce to their demands that Plaintiff stop identifying significant problems about the Agency, its management, and systems.

170.    Defendants' discrimination against Plaintiff caused Plaintiff to suffer damages, including, reputational harm, emotional distress, and to incur substantial costs in defending himself.

171.    Defendants willfully discriminated against Plaintiff in violation of the ADEA, or acted with reckless disregard of Plaintiff's rights under the ADEA, thereby entitling Plaintiff to liquidated damages.

172.    Plaintiff has also incurred and continues to incur injury, including but not limited to: emotional distress, reputational harm, the loss of any potential opportunity to advance within FHFA, and attorney's fees and costs.

## COUNT TWO

### AGE DISCRIMINATION IN VIOLATION OF THE
### DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

173.    Plaintiff incorporates and realleges the foregoing paragraphs as though fully set forth

herein.

174.    Plaintiff is a member of a protected class.

175.    Defendants through their supervisors and managers treated Plaintiff differently on the

basis of age, sought to discredit him as an employee on the basis of their own parochial and

impermissible stereotypes about older employees in order to prevent him from drawing

attention to problems at the agency. When Plaintiff refused to acquiesce, he suffered tangible

adverse employment actions.

176.    The discriminatory treatment of Plaintiff on the basis of age by managers and supervisors

at FHFA constitutes a violation of the District of Columbia Human Rights Act ("DCHRA"),

DC Code Sec. 2-1401.01, *et seq.*.

177.    Joyce, Crump, and Harte were acting within the scope of their employment when they

engaged in prohibited discrimination.

178.    Defendants had actual and constructive knowledge of the age discrimination and did not

take remedial action.

179.    Defendants' discriminatory practices have caused Plaintiff harm, including emotional

distress and have resulted in his early retirement from the Agency.

180.    Accordingly, Defendants have violated Plaintiff's rights protected by the DCHRA, D.C.

Code §2-1401.01, *et seq.*.

## COUNT THREE

### RETALIATION UNDER THE
### AGE DISCRIMINATION IN EMPLOYMENT ACT

181.    Plaintiff incorporates and realleges the foregoing paragraphs as though fully set forth

herein.

182.    Plaintiff opposed unlawful employment practices by objecting to Defendants'

discriminatory actions taken against him due to his age and disclosing to management

ongoing problems with Agency operations, including filing a grievance, initiating an

investigation and filing charges with the Equal Employment Opportunity Commission. Such

activities are protected under Title 29 U.S.C. §621, *et seq.*

183.    Following such actions, Plaintiff has faced actions such as a written reprimand,

unfavorable job assignments, unjustified poor job performance ratings, and loss of

telecommuting privileges. These actions constitute retaliation in violation of 29 U.S.C.

§623(d).

184.    Defendants Joyce and Crump and other supervisors were acting within the scope of their

employment when they retaliated against Plaintiff.

185.    Defendants' discriminatory practices have caused Plaintiff harm, including emotional

distress and reputational harm.

186.    Accordingly, Defendants have violated Plaintiff's rights protected by Title 29 U.S.C.

§623(d).

## COUNT FOUR

### RETALIATION UNDER THE
### DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

187.    Plaintiff incorporates and realleges the foregoing paragraphs as though fully set forth

herein.

188.    Plaintiff opposed unlawful employment practices by objecting to Defendants'

discriminatory actions taken against him due to his age and disclosing to management

ongoing problems with Agency operations, including filing a grievance, initiating an

investigation and filing charges with the Equal Employment Opportunity Commission. Such

activities are protected under the DCHRA, D.C. Code §2-1402.11, *et seq.*.

189.    Following such actions, Plaintiff has faced actions such as a written reprimand,

unfavorable job assignments, unjustified poor job performance ratings, and loss of

telecommuting privileges. These actions constitute retaliation in violation of the District of

Columbia Human Rights Act, D.C. Code §2-1402.11, *et seq.*.

190.    Defendants Joyce and Crump were acting within the scope of their employment when

they retaliated against Plaintiff.

191.    Defendants had actual and constructive knowledge of the discrimination based on age

perpetrated against Plaintiff and refused to take remedial action.

192.    Defendants' discriminatory practices have caused Plaintiff harm, including emotional

distress.

193.    Accordingly, Defendants have violated Plaintiff's rights protected by the DCHRA, D.C.

Code §2-1402.11, *et seq.*.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff requests that this Honorable Court award:

      a.      Compensatory damages sufficient to redress the harms that Plaintiff has suffered;

      b.      Liquidated damages under the ADEA;

      c.      Punitive damages under the DCHRA;

      d.      Legal fees and costs;

      e.      Interest;

      f.      Such other relief that in law or equity may pertain.

## JURY DEMAND

Plaintiff demands a trial by jury for any and all issues proper to so be tried.

Dated: April 24, 2020

                 Respectfully submitted,

                 /s/ J. Robert Flores

                 _____

                 J. Robert Flores (Bar No.: VA078)
                 Gammon & Grange, P.C.
                 8280 Greensboro Drive
                 Suite 140
                 McLean, VA 22102
                 Phone:  703-609-8731
                 Fax:      703-761-5023
                 Email:  JRF@GG-Law.com
                 Attorney for Defendant Jay D. Jacobsen